57 So.2d 510

### PITTMAN v. PITTMAN et al.
### 4 Div. 647.

Supreme Court of Alabama.
March 10, 1952.

81

Meader, Yung & Bell, Montgomery and Moseley & McIlwain, Union Springs, for appellant.

Lawrence K. Andrews and R. E. L. Cope, Union Springs, for appellees.

SIMPSON, Justice.

On a former appeal in this case we reviewed an interlocutory decree overruling a demurrer to the original bill. Pittman v. Pittman, 247 Ala. 458, 25 So.2d 26. After affirmance, respondent filed answer and cross-bill and the cause was submitted for final decree on pleading and proof. This appeal is from the final decree granting relief to complainants. The same legal questions presented on former appeal are again before us now and are to be determined in the light of the evidence; that is to say, the issue now confronting us is one of fact.

Since the substance of the bill is adequately stated in the report on former appeal, it need only be stated that the purpose of the litigation was to have a deed to land, executed by appellees to appellant, cancelled as a cloud upon appellees' title. The evidence is too voluminous to state it here in detail, and we confine ourselves to a resume of its material tendencies.

Mrs. Mary Pittman was the owner of a life estate in the property in suit, consisting of some fifty acres of land and the appurtenances. For many years she occupied it as a home for herself and her children, who owned the reversionary interest. Sometime prior to 1909 the property was in bad repair and Mrs. Pittman moved to another home in Union Springs. She had six children, three daughters and three sons. One daughter (Anastasia) became mentally incompetent. For a while the property brought low rental, but later became vacant. Five of the children (Virginia, Mary C., Andrew, Norborn and Foster) orally agreed among themselves that Foster should take over the property and pay to his mother a stated sum as rent. Since some improvements and repairs were necessary, it was agreed that all the reversionary interests be conveyed to Foster for a consideration to be paid upon the falling in of the life estate, with the further understanding that should the proposed transfer be not carried out, Foster should have a lien on the property for his expenditures. Apparently the basic consideration in the minds of all was the securing of an income to the mother during her lifetime. Foster took over the property about the year 1909, making some repairs to barn and fences and later, when he had married, making some major repairs to the dwelling house. He moved into the dwelling in 1913. His mother lived with him until 1918, then went to live with complainants or one of them. Foster continued to live on the property until 1924, when he removed from it and from Union Springs. He paid rent to his mother until she came to live with him in 1918. Apparently he paid no rent thereafter.

In 1915 the five brothers and sisters agreed upon an attorney in Union Springs who should carry their agreement into effect. A deed was prepared, whereby Virginia (then married to Ravenscroft), Mary C., Andrew and Norborn (the latter being also married) conveyed their reversionary interests, and such interest as they might later acquire from Anastasia, to Foster for a recited consideration of $3,000. There was a mortgage from Foster to the named grantors securing a recited indebtedness of $2,000, evidenced by four notes of $500 each, payable to the mortgagees individually, due upon the death of the life tenant, and bearing no interest. While dated January 22, 1915, the papers were not completely executed until June 19, 1915. At that time, the deed having come back to Mr. Norman, the attorney, executed by the last of the grantors, he notified Foster to come

in and execute his mortgage. Foster went to the office of Mr. Norman, accompanied by his brother Norborn. Mr. Norman handed Foster the deed, which the latter examined for signatures and then returned to Mr. Norman. He thereupon executed the mortgage and the four notes. Norborn was given the note payable to him, and he hypothecated it to secure some personal indebtedness. Under what circumstances does not appear, but Norborn obtained the mortgage and had it recorded in December, 1915. What became of the original mortgage thereafter does not appear. The transferee of his note died without collecting it (it was not payable until the death of Mrs. Pittman, senior). The transferee's heirs, if any, appear not to be known, and are not parties to the suit. Norborn soon left Union Springs, made one or two returns with long intervals between. Since 1933 he has not been heard from. He was made a party respondent to the suit, but made no appearance. Andrew, soon after execution of the deed, was committed to an institution as a mental incompetent, and is represented by a guardian ad litem.

Complainants, Mrs. Virginia Pittman Ravenscroft and Miss Mary C. Pittman, expressed some dissatisfaction with the transaction as early as the fall of 1915. They made an unsuccessful attempt to obtain the deed from Mr. Norman and, failing this, to obtain the mortgage and their notes. Mr. Norman declined to deliver up any of the papers without the agreement of Foster Pittman, the grantee and mortgagor. A second attempt to this end was made by complainants, with like response. From time to time complainants made effort to have Foster return the deed or complete the transaction by turning over the mortgage and notes to complainants. He declined. Mr. Norman died in 1927, still in possession of the deed and the three notes. After his death complainants undertook to acquire the deed from Mr. Norman's executor. He refused their request, but without their consent and without their knowledge delivered the deed to Foster Pittman. The latter put the deed on record in the year 1930. The complainants discovered in 1935 that the deed had been recorded. They continued their efforts to have the transaction rescinded. They employed attorneys to represent them, and some negotiations with Foster followed. Later complainants employed their present attorneys, who filed suit to cancel the deed in 1942. The life tenant was then living, but died the following year, pending the litigation.

The only positive evidence relating to a delivery of the papers is the testimony of Foster to the effect that Mr. Norman handed him the deed, and that he handed it back to Mr. Norman with the request that he keep it for him. Although Norborn Pittman was present at the time and without question obtained his note, and later the mortgage which, as we have said, he put on record, it appears with reasonable certainty that he represented only himself. He was in financial difficulties and was pressing to have the transaction closed in order to derive some immediate benefit from his note. According to the testimony of Foster, Norborn's transferee required a recording of the mortgage. According to complainants' testimony, they never did see or have possession of the mortgage or any of the notes.

The first question posed is that of laches on the part of complainants. True, some twenty-seven years elapsed between the execution of the deed and the filing of the bill; but intervening facts and circumstances tend to show that complainants did not discover until 1935 that which served to put them upon notice that the deed had come into the possession of the respondent. The declination of the attorney to surrender up any of the papers without concurrence of Foster, the retention of the deed by him, and the withholding of it from record, together with other circumstances, were calculated to lead complainants to the belief that there had been no delivery of the deed. Foster did nothing himself to dispel such a belief, making no effort to obtain and record the deed, or to secure and deliver or offer to deliver the mortgage and notes to complainants; and this, notwithstanding complainants had registered dissatisfaction with the transaction and persisted in their insistence upon a return of the deed to them or a delivery to them of their notes. After discovery of the record of the deed, com-

84

plainants by themselves and through attorneys pursued such measures as seemed open to them, leading finally to the filing of the bill.

No arbitrary rule exists as to when a demand becomes stale or what delay will be excused, and the question of laches is to be decided upon the particular circumstances of each case. Wells v. Wells, 249 Ala. 649, 32 So.2d 697; Davidson v. Blackwood, 250 Ala. 263, 34 So.2d 205.

In Taunton v. Trammell, 254 Ala. 252, 48 So.2d 190, 192, we quoted with approval from Pomeroy's Equity Jurisprudence as follows: " * * * 'Laches is not mere delay, but such delay that works a disadvantage to another. So long as parties are in the same condition it matters little whether one presses a right promptly or slowly, within limits allowed by law; but when knowing his rights, he takes no steps to enforce them until the condition of the other party has in good faith become so changed that he cannot be restored to his former state, if the right be then enforced, delay becomes inequitable, and operates as estoppel against the assertion of right.' * *"

No change of condition to the disadvantage of the respondent is made to appear. He occupied the land so long as he wished to do so, finally leaving it of his own volition. What of major expenditures he made upon the property occurred some years prior to the execution of the deed. After obtaining and recording his deed he apparently showed no further immediate interest in it. The event bringing the deed into operation, death of the life tenant, had not then occurred. We have said that the courts, in applying the doctrine of laches, although sensitive to economic and business interest, the certainty of contracts and stability of titles, recognize that their major business is the administration of justice. First National Bank of Opp v. Wise, 235 Ala. 124, 177 So. 636. We conclude that it is but justice to hold, as did the court below, that complainants were not barred by laches in the bringing of their suit. Respondent, after making use of the property during the pendency of the life estate so long as he wished to do so, retains that which, without the deed, he had in the beginning—a proportionate title in remainder.

The propriety of the finding of the trial court that there had been no effectual delivery of the deed to respondent is, we think, likewise sustained by the evidence. The mere exchange of manual possession of the deed under the circumstances shown, standing alone, did not constitute a delivery. Delivery involves intent, the test being whether the grantor, or one authoritatively acting for him, intended to reserve to himself the *locus poenitentiae*. Thomas v. Dreyspring, 232 Ala. 99, 167 So. 262; Williams v. Dent, 233 Ala. 109, 170 So. 202. See, also, Low v. Low, 255 Ala. 536, 52 So. 2d 218. There is an absence of evidence that Mr. Norman was or was not authorized to make a delivery of the deed to respondent at the time. Under the surrounding circumstances, there is a reasonable inference that he, the attorney, did not then intend a delivery of the deed. It could not be supposed that he had authority to deliver the deed and yet withhold the notes and mortgage from delivery to complainants.

We discover no sound basis for the establishment of a lien in favor of respondent, appellant, on account of improvements and repairs made by him upon the property in suit. His expenditures in this regard were, it would seem, for his own benefit, of which he got the full use. At the time of his removal from the property, the evidence tends to show the dwelling had fallen into disrepair and was repaired by the life tenant.

It is our opinion that the decree appealed from should be in all things affirmed. It is so ordered.

Affirmed.

BROWN, FOSTER, LAWSON, and STAKELY, JJ., concur.